1

**BURSOR & FISHER, P.A.**
Neal J. Deckant (State Bar No. 322946)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-Mail: ndeckant@bursor.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REBEKKA LIEN and JAKE SEEVERS, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>  v.<br><br>TALKDESK, INC.<br><br>    Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Rebekka Lien ("Lien") and Plaintiff Jake Seevers ("Seevers") (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to allegations specifically pertaining to themselves and their counsel, which are based on personal knowledge.

## NATURE OF ACTION

1.      Defendant Talkdesk, Inc. ("Defendant" or "Talkdesk") has developed and provides a customer service product powered by artificial intelligence ("AI") called Talkdesk CX Cloud (hereafter "CX Cloud").  Talkdesk provides the CX Cloud as a software-as-a-service ("SaaS") to other companies operating a customer service center.  That is, the CX Cloud software is accessed online via a subscription, rather than bought and installed on individual computers.

2.      CX Cloud technology is employed by Talkdesk's numerous business customers, including Patagonia, Inc. ("Patagonia") and Zumiez, Inc. ("Zumiez") to allow Talkdesk to monitor the contents of telephone conversations between contact center agents and their customers from California to receive customer support and to derive data-driven insights from those conversations ("Contact Centers").

3.      Talkdesk intentionally designed CX Cloud to read, record, access, and learn the content and meaning of callers' conversations between Californians and customer service representatives.

4.      By virtue of providing the CX Cloud service, however, Defendant also taps, intercepts, monitors, listens to, reads, receives, records, transcribes, learns and analyzes in real-time (within milliseconds or virtually immediately) the contents of conversations between Californians and customer service representatives while they are in transit, all without procuring or requiring callers' consent.

5.      Therefore, when Talkdesk—a separate and distinct third-party entity from the parties to these conversations—provided CX Cloud to Patagonia and Zumiez, it was

Defendant's intention to record the confidential communications of Patagonia's and Zumiez's customers.

6.     Neither Defendant nor Patagonia nor Zumiez procured the express consent—written or otherwise—of persons who interacted with Patagonia's or Zumiez's Contact Centers, prior to Defendant listening to, recording, accessing, reading, transcribing, learning and analyzing the contents of conversations between Californians and Patagonia's and Zumiez's customer service representatives.

7.     Moreover, Talkdesk has the capability to use the contents of conversations it collects through its CX Cloud for purposes other than simply providing a recording to Patagonia or Zumiez, including improving its services.

8.     In sum, CX Cloud was designed to learn and analyze real-time phone conversations.  When Talkdesk provided CX Cloud to Patagonia and Zumiez, Talkdesk understood and therefore intended to record the communications of customers who called into those three Contact Centers.  As such, Talkdesk actively offers and conducts an eavesdropping service as an independent third party, unbeknownst to Plaintiffs.

9.     Through its use of CX Cloud, therefore, Defendant has failed to comply with the California Invasion of Privacy Act ("CIPA") § 631.

10.     Plaintiffs bring this action to prevent Defendant from further violating the privacy rights of California residents, and to recover statutory damages for Defendant having listened to, recorded, accessed, read, learned and analyzed the contents of conversations between Californians and Patagonia and Zumiez without procuring prior consent, in contravention of CIPA.

## **PARTIES**

11.     Plaintiff Lien resides in Alhambra, California and has an intent to remain there, and is therefore a citizen of California.  Lien was in California when she spoke to a representative from Patagonia over the phone on or about July 31, 2024.

12.     Plaintiff Seevers resides in Alhambra, California and has an intent to remain there, and is therefore a citizen of California.  Seevers was in California when he spoke to a representative from Zumiez over the phone on or about August 1, 2024

13.     Defendant Talkdesk, Inc. is a Delaware corporation with its principal place of business located at 201 Spear St Ste 100, San Francisco, California, 94105.  Talkdesk is valued at more than $10 billion, "placing Talkdesk among the most highly valued private companies in the SaaS or enterprise software space."[1]  Talkdesk provides a cloud-based call-center software provider solution called CX Cloud, which is at issue here and described more fully below.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action where there are more than 100 members and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one member of the putative Class is a citizen of a state different from Defendant.

15.     This Court has personal jurisdiction over the Defendant because Defendant's principal place of business is in California.

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant resides in this District.

## FACTUAL BACKGROUND

### I.    THE CALIFORNIA INVASION OF PRIVACY ACT

17.     The California Legislature enacted the Invasion of Privacy Act to protect certain privacy rights of California citizens.  The legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society."  Cal. Penal Code § 630.

---

[1] https://www.talkdesk.com/news-and-press/press-releases/talkdesk-raises-series-d-funding/

18.     As the California Supreme Court has held in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its *simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*
>
> ...
>
> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas v. Clark*, 38 Cal. 3d 355, 360-61 (1985) (emphasis added; internal citations omitted).

19.     As part of CIPA, the California Legislature enacted Section 631(a), which prohibits any person or entity from (i) "intentionally tap[ping], or mak[ing] any unauthorized connection ... with any telegraph or telephone wire," (ii) "willfully and without the consent of all parties to the communication … read[ing], or attempt[ing] to read, or to learn the contents or meaning of any … communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within [California]," or (iii) "us[ing], or attempt[ing] to use … any information so obtained."  CIPA § 631(a) also penalizes those who "aid[], agree[] with, employ[], or conspire[] with any person" who conducts the aforementioned wiretapping.

20.     Individuals may bring an action against the violator of CIPA § 631 for $5,000 per violation.  Cal. Penal Code § 637.2(a)(1).

## II.     DEFENDANT VIOLATES THE CALIFORNIA INVASION OF PRIVACY ACT § 631(A)

21.     CX Cloud is an AI-powered platform designed to "[t]urn every interaction [between Contact Center agents and their callers] into customer intelligence" as Talkdesk listens to, records, transcribes, reads, learns and "analyze[s] all customer interactions to discover intent

and sentiment patterns"[2] to help Talkdesk's business customers provide better customer service—all in real time.

22.    CX Cloud has been deployed by the Contact Centers of numerous business customers, including that of Patagonia, a designer of outdoor clothing and gear.[3]  Talkdesk's website includes a customer story centered around its partnership with Patagonia which employed CX Cloud in 2021 to assist Patagonia's Contact Center agents in handling calls from their customers.[4]  "In 2023, Patagonia added Customer Experience Analytics and Quality Management to their tech stack," which are two add-on services offered by Talkdesk, among several others, such as Interaction Analytics and Talkdesk Agent Assist or CoPilot that are combined with CX Cloud (collectively, the "Services").

23.    CX Cloud has also been deployed by the Contact Center of Zumiez, which sells skateboarding clothing and gear.[5]  Talkdesk admits on its website that Zumiez has been a client since before 2018 using "the Talkdesk open-cloud platform" and that "[p]lans are underway to integrate Talkdesk and Zendesk with their order management system to create a 'triple threat' of customer service, customer context, and concierge support."[6]  "With Talkdesk as their partner in providing a great customer experience, the Zumiez team continues to build its loyal following of customers by empowering agents to better serve them."[7]  Talkdesk provides Zumiez's agents with "real-time dashboards that let agents make workflow decisions on the fly to ensure that customers' needs are met."[8]  Zumiez takes advantage of Talkdesk's Services, including "call

---

[2] https://www.talkdesk.com/cloud-contact-center/customer-experience-analytics/

[3] https://www.patagonia.com/home/

[4] https://infra-cloudfront-talkdeskcom.svc.talkdeskapp.com/talkdesk_com/patagonia-customer-story.pdf

[5] https://www.talkdesk.com/customers/zumiez/

[6] *Id.*

[7] *Id.*

[8] *Id.*

recording and easy access to reports and contact center performance metrics," enabling supervisors to "tailor coaching to specific agent needs and zero in on ways to help them take customer service to the next level."[9]

24.     Talkdesk, through CX Cloud, does not simply listen in on the conversation between the caller and Patagonia and Zumiez though.  It also transcribes calls in real time for agents to reference during the call or for analysis after the call without telling the caller it is doing so.  Interaction Analytics, an AI-powered speech and text analytics tool, "captures, transcribes, and analyzes every customer interaction using AI to identify key conversation moments, topics, and sentiment that help agents understand customer intent."[10]

25.     Related to customer intent, "every sentence that is being spoken during a call, either by the caller or by the agent, and then transcribed, is an utterance" and the "intended action that the speaker has expressed in the utterance is an intent."[11]  Talkdesk recommends that customers like Patagonia and Zumiez "set up, at least, three to five common intents relevant for your business and that represent also the frequent work of your contact center, like Cancelation, Escalation, Refund, Inquiry, among others" which can be further refined later "into more granular topics."[12]  Thus, CX Cloud and the Services capture the caller's intent from the content of the conversation.

26.     Aside from eavesdropping on the reason for the call or intent, Talkdesk applies sentiment tags using Customer Experience Analytics and Quality Management.  Customer Experience Analytics are used by Patagonia "to score every transaction" or call to "mine[]" it to help identify "customer mood trends and pain points."[13]

---

[9] *Id.*

[10] https://www.talkdesk.com/es-es/blog/what-is-asr-technology/

[11] https://support.talkdesk.com/hc/en-us/articles/8371776409243-AI-Trainer-FAQ-Intent-Models

[12] *Id.*

[13] https://www.talkdesk.com/resources/videos/customer-experience-analytics/

And by using AI to score every interaction

27.    Quality Management services, also adopted by Patagonia, evaluate individual representatives' interactions with their customers.[14]  A video on Talkdesk's Quality Management page, which is linked to the customer story for Patagonia, states that Quality Management "makes it easier to turn every interaction [with customers] into an opportunity to learn and improve."[15]  The video notes that "[r]ecording and analytics are the foundation of effective quality management."

---

[14] https://infra-cloudfront-talkdeskcom.svc.talkdeskapp.com/talkdesk_com/patagonia-customer-story.pdf

[15] https://www.talkdesk.com/cloud-contact-center/wem/quality-management/



28.     The video continues, stating that "Talkdesk combines audio and screen recording with omnichannel transcripts to provide a single unified view of every customer interaction." Furthermore, "[e]ach recording is processed using speech analytics to automatically apply topic and sentiment tags and prioritize interactions for further review." *Id*.





29.     "[S]entiment analysis allows brands to tap into the emotions, opinions, and attitudes of their customers."[16]  "Using AI, [natural language processing or] NLP, and other machine learning algorithms sentiment analysis models detect patterns in voice or text and classify customer emotions in three or more different categories—positive, negative, neutral, or more fine-grained."[17]

30.     Talkdesk's Interaction Analytics goes "beyond traditional sentiment analysis and extract[s] nuanced mood insights to understand how customers are feeling and why they're feeling that way."[18]

31.     In addition to capturing a caller's emotions and moods, Talkdesk, through its CX Cloud and Services, also actively learns the real-time contents of conversations between companies like Patagonia and Zumiez and their callers to provide agents with step-by-step guidance in handling the content of the calls  (*i.e.*, helping with responding to each caller's specific inquiries or concerns).  Interaction Analytics supports Contact Center agents "by finding key customer intents and sentiments and suggesting the next best action."[19]

---

[16] https://www.talkdesk.com/blog/customer-sentiment/

[17] *Id.*

[18] https://www.talkdesk.com/cloud-contact-center/customer-experience-analytics/interaction-analytics-sentiment/

[19] https://www.talkdesk.com/blog/customer-sentiment/

32.     Talkdesk even offers Contact Center agents Talkdesk Agent Assist, a personalized AI assistant that listens, learns, and assists agents in every conversation."[20]  It "empower[s] agents to resolve customer inquiries faster and reduce average handle time."[21] Specifically, Agent Assist™ "listens" to the caller's questions or concerns, "provides real-time call transcriptions so agents can easily keep track of the conversation," and "provides agents with precise answers, recommendations, and automations in every conversation."[22]  "Generative AI [even] taps into trusted information from [a business customer's] knowledge base to suggest answers suited to the interaction's context, tone, audience, and channel."[23]

33.     Finally, CX Cloud also analyzes keywords uttered by callers which "trigger an alert to contact center or other business systems, on problems that need immediate attention."[24] This allows business customers "to stay on top of customer issues by defining a set of keywords to be monitored and fine-tuning them by setting parameters based on the number of hits, time range, and frequency."[25]

34.     In sum, Talkdesk listens to, records, transcribes, accesses, reads, learns and analyzes the contents of conversations between Californians and its business customers, including Patagonia, using CX Cloud and the Services' features (including, *inter alia*, real-time call recording, call transcription, and analysis thereof).

35.     Whenever callers reach out to Patagonia's and Zumiez's Contact Center, which are embedded with CX Cloud, those calls are intercepted, listened to, read and used by Talkdesk, an undisclosed third party.

---

[20] https://www.talkdesk.com/es-es/blog/what-is-asr-technology/

[21] https://www.talkdesk.com/cloud-contact-center/omnichannel-engagement/copilot/

[22] https://infra-cloudfront-talkdeskcom.svc.talkdeskapp.com/talkdesk_com/ai-actually-helps-agents-resolve-issues-correctly-quickly-datasheet.pdf

[23] *Id.*

[24] *Id.*

[25] https://support.talkdesk.com/hc/en-us/sections/6174855639707-Talkdesk-CX-Sensors

36.     Talkdesk records, transcribes, and uses its AI models to analyze the Contact Center caller's interactions to determine what the caller is talking about, the caller's intent, how the caller is feeling, and assists the agents with transcriptions and responses in real time.  It then transmits that information to Talkdesk's recording servers every few seconds, which Talkdesk then makes available to its business customers, including Patagonia and Zumiez.

37.     Talkdesk's software seamlessly incorporates into its business customers' Contact Centers, including Patagonia's and Zumiez's, without notice to callers that Talkdesk is even involved in the call.  Talkdesk listens to the caller in the background of a call, and in such a way that consumers, like Plaintiffs, will likely be entirely unaware they are unknowingly interacting with a third-party company.

38.     In sum, by virtue of providing CX Cloud to its business customers, Defendant intentionally tapped, intercepted, read, recorded, and then transcribed callers' utterances using automated speech recognition ("ASR") and NLP so that Talkdesk's AI could "read" it, identify patterns, and classify the data.[26]  Every telephone conversation between Patagonia's and Zumiez's Contact Centers and callers from California is routed directly to Talkdesk's servers[27] in real-time where they are collected, recorded, transcribed, and analyzed by AI models to determine the reason for the call and how the caller is feeling during the call.

39.     Talkdesk's software exposes consumers to significant risks, especially related to its sentiment analysis an automated process that uses AI and NLP "to detect patterns in [the caller's] voice [and tone]."[28]  Voices are highly personal and can reveal sensitive information about an individual's mental state and behaviors.

40.     Individuals who call a business's Contact Center have a range of reasons to do so.  Reasons for the calls include, among other things, to purchase or return products, request

---

[26] https://www.talkdesk.com/es-es/blog/what-is-asr-technology/

[27] https://support.talkdesk.com/hc/en-us/articles/201760169-Where-are-your-servers-located; *see also*, https://www.talkdesk.com/contact-center-platform/reliability-availability/

[28] https://www.talkdesk.com/blog/customer-sentiment/

repairs, ask a shipping or delivery question, or receive additional forms of support. The callers typically disclose a wide variety of personally identifiable information (PII) including their name, address, telephone number, credit card numbers and other sensitive financial and personal information to agents.

41.     Callers to Patagonia do the same but may also "engage with Patagonia on more than just products. Representatives have impactful, authentic conversations with customers because they share a deep appreciation for the products, an awareness of environmental issues and company initiatives, and personal experiences with activism. Customers and customer service representatives often inspire each other to become more involved in a higher purpose."[29] These individuals, who contact Patagonia, like Plaintiff Lien, believe they are having a conversation with just Patagonia. Likewise, Plaintiff Seevers believed he was having a conversation with just Zumiez. They do not expect that a third party will be listening in and recording their confidential conversation.

42.     Customers expect the conversation they are having with a Patagonia or Zumiez representative to be only between themselves and the human customer service agent. They do not expect, nor do they have any reason to suspect, that Talkdesk or any other third party is listening in on the conversation. After all, that is the point of calling Patagonia or Zumiez directly.

43.     And yet, contrary to those expectations, Talkdesk is *listening, analyzing and breaking down the call.* In other words, Talkdesk, through CX Cloud, is actively analyzing the real-time contents of conversations between companies like Patagonia and Zumiez and their customers.

44.     Since 2021, Patagonia has contracted with Talkdesk to listen in on conversations through CX Cloud, and for Talkdesk to provide at least some, if not all, of the Services

---

[29] https://infra-cloudfront-talkdeskcom.svc.talkdeskapp.com/talkdesk_com/patagonia-customer-story.pdf

mentioned above.[30]  Zumiez has contracted with Talkdesk at least since 2018 to listen in on conversations through CX Cloud, and for Talkdesk to provide at least some, if not all, of the Services mentioned above.[31]

45.    Talkdesk profits from its provision of the CX Cloud service.  For instance, Talkdesk has four scalable CX Cloud plans: it charges its clients $85/user/month for its Essential plan and Digital Essentials plan, $115/user/month for its Elevate plan, and $145/user/month for its Elite plan.[32]

46.    When CX Cloud and the Services are used in a telephone conversation, it is not like a tape recorder, or a "tool" used by one party to record the other.  Instead, they involve Talkdesk—a separate and distinct third-party entity from the parties to the conversation—using CX Cloud and the Services to eavesdrop upon and record a conversation to which it is not a party.  This is so because Talkdesk itself is collecting the content of any conversation before that data is provided to any entity that was a party to the conversation (like Patagonia or Zumiez).

47.    "When Talkdesk provides a cloud service and acts on behalf of its customers," like Patagonia or Zumiez, it also collects a customer's name, phone number and email; call metadata such as the date, time and duration of the call; call recordings and transcriptions; and "content data" or "personal data that may be included in communications or as a result of Talkdesk products and services."[33]

48.    Talkdesk has the capability to use this data and the contents of the communications it collects for independent purposes.  Its own "Terms of Service" has a section pertaining to "Use of Services and Customer Data."[34]  Aside from using Customer Data to

---

[30] https://www.talkdesk.com/about/cx-awards/

[31] https://www.talkdesk.com/blog/zumiez-convert-customers-into-fans/

[32] https://getvoip.com/blog/talkdesk-pricing/.

[33] TALKDESK PRIVACY NOTICE, https://infra-cloudfront-talkdeskcom.svc.talkdeskapp.com/talkdesk_com/talkdesk-privacy-notice-april-2023.pdf.

[34] TALKDESK TERMS OF SERVICE, https://www.talkdesk.com/terms-of-service/.

provide the services required by its agreements with Patagonia and Zumiez,"[35] Section 3.8 of the Terms of Service states that Talkdesk "may use de-identified, aggregated Customer Data for the purpose of maintaining or improving the Services or Marketplace." Likewise, in its Privacy Policy, Talkdesk admits that it "may keep anonymized information … for longer periods for analysis of how service is used and for the improvement of it."[36]

49.    Section 3.8 of the Terms of Service also grants to Talkdesk "a worldwide, perpetual, irrevocable, royalty free license to use and incorporate into its services any suggestion, enhancement request, recommendation, correction or other feedback provided by Customer or Authorized Users relating to the operation of Talkdesk's … business." That is, if Patagonia or Zumiez offered Talkdesk any feedback about the services, those improvements or suggestions, are now irremovably licensed to Talkdesk.

50.    Talkdesk is always looking to improve its AI. After all, it recognizes that an AI model "is a mathematical algorithm that is 'trained' using data and human expert input."[37] The more data Talkdesk possesses and human input it receives to train its AI, the better its AI gets. Talkdesk knows this and so it allows its business customers to "improve the automation present on Talkdesk products such as Copilot, Knowledge Management, Interaction Analytics, or Autopilot" by allowing their customers to revise the suggestions their agents receive on their screens during a call by editing "sentences and add[ing] improvements to them, thus training the system to better understand the intents and the words mentioned and transcribed during each contact center interaction."[38] Thus, Talkdesk is ultimately using the wiretapped communications—which form the basis for these suggestions—to train and improve its AI.

---

[35] *Id*.

[36] TALKDESK PRIVACY NOTICE, https://infra-cloudfront-talkdeskcom.svc.talkdeskapp.com/talkdesk_com/talkdesk-privacy-notice-april-2023.pdf.

[37] https://support.talkdesk.com/hc/en-us/articles/4402552489613-Getting-Started-with-AI-Trainer

[38] *Id*.

51.    Notably, according to sections 3.8 and 8.1 of the Terms of Service, customers that help improve or enhance the data through their modifications do not have any right, title or interest in those modifications; Talkdesk does instead.[39]  In all these ways, Talkdesk has the capability to use the wiretapped data it collects through CX Cloud to improve the AI-based products, interactions, analytics, and services Talkdesk provides and to develop new Talkdesk products and services.

52.    During consumers' calls to the Contact Centers, Patagonia and Zumiez fail to inform consumers, prior to any recording: (i) that Talkdesk, a third party, is listening in on consumers' communications, (ii) that Talkdesk, a third party, is tapping or otherwise making an unauthorized connection with the consumer's telephone conversation using CX Cloud, and (iii) that the content of consumers' confidential communications with the Contact Centers are being recorded, collected, intercepted, and analyzed by Talkdesk, a third party, using CX Cloud.

53.    The CX Cloud service was designed to record and analyze real-time phone conversations.  When Talkdesk provided CX Cloud to Patagonia and Zumiez, Talkdesk understood and therefore intended to record the communications of customers who called into those Contact Centers.  As such, Talkdesk actively offers and conducts an eavesdropping service as an independent third party, unbeknownst to Plaintiffs.

54.    Therefore, Defendant's conduct violates the rights of Californians set forth in CIPA § 631.

III.    PLAINTIFFS' EXPERIENCES

A.    Plaintiff Lien

55.    Plaintiff Lien called Patagonia's Contact Center on or about July 31, 2024 on her personal telephone, and not in the direct presence of others.

56.    In this conversation, Lien reasonably expected her conversation with Patagonia to be only between herself and Patagonia.

---

[39] TALKDESK TERMS OF SERVICE, https://www.talkdesk.com/terms-of-service/.

57.     Neither Talkdesk nor Patagonia disclosed to Plaintiff that her conversation with Patagonia would be listened to by a third party, Talkdesk.

58.     Lien was thus not aware, nor did she have any reason to suspect, that Talkdesk, a third party, was listening in on her conversation.

59.     Nevertheless, unbeknownst to Lien, Talkdesk, through CX Cloud and its Services, eavesdropped on Plaintiff's entire conversation with Patagonia's Contact Center agent. Talkdesk, through CX Cloud and the Services, monitored the conversation between Plaintiff and Patagonia.  Talkdesk recorded and transcribed Plaintiff's conversation in real time, and then transmitted that information to Talkdesk's recording servers every few seconds to perform AI analysis thereon.  That AI analysis captured Lien's intent and/or reason for calling; extracted mood, tone and/or sentiment insights to understand how she was feeling during the call; and tracked any keywords she may have said during the conversation.  Lien, during the call, asked about Patagonia's store hours and events, and disclosed her telephone number.  Talkdesk's technology captured her personal information and extracted insights.

60.     Through this process, Talkdesk read and learned, in real time, the contents of Plaintiff's conversation with Patagonia.

61.     Neither Patagonia nor Talkdesk procured Plaintiff's prior consent, express or otherwise, to have Defendant eavesdrop on Plaintiff's conversation with Patagonia.  Nor did Plaintiff give her prior consent, express or otherwise, to Talkdesk or Patagonia to allow Defendant to wiretap her confidential communications with Patagonia.

62.     Patagonia failed to inform Plaintiff Lien, prior to recording: (i) that a third party, Talkdesk, was listening in on Plaintiff's communications with Patagonia, (ii) that a third party, Talkdesk, was tapping or otherwise making an unauthorized connection with Plaintiff's telephone conversation using CX Cloud and the Services, and (iii) that the content of Plaintiff's confidential communications with Patagonia were being recorded, collected, intercepted, and analyzed by a third party, Talkdesk, using CX Cloud and the Services.  Patagonia therefore failed to procure Plaintiff's consent for the conduct at issue.

63.    Talkdesk also failed to procure Plaintiff Lien's consent for Talkdesk's software recording and examination of her voice for emotion, tone, or mood and the content of her communications.

64.    Plaintiff Lien has, accordingly, had her privacy invaded and been exposed to the risks and harmful conditions created by Talkdesk's violations of CIPA alleged herein.

**B.    Plaintiff Seevers**

65.    Plaintiff Seevers called Zumiez's Contact Center on or about August 1, 2024 on his personal telephone, and not in the direct presence of others.

66.    In this conversation, Seevers reasonably expected his conversation with Zumiez to be only between himself and Zumiez.

67.    Neither Talkdesk nor Zumiez disclosed to Plaintiff that his conversation with Zumiez would be listened to by a third party, Talkdesk.

68.    Seevers was thus not aware, nor did he have any reason to suspect, that Talkdesk, a third party, was listening in on his conversation.

69.    Nevertheless, unbeknownst to Seevers, Talkdesk, through CX Cloud and its Services, eavesdropped on Plaintiff's entire conversation with Zumiez's Contact Center agent. Talkdesk, through CX Cloud and the Services, monitored the conversation between Plaintiff and Zumiez.  Talkdesk recorded and transcribed Plaintiff's conversation in real time, and then transmitted that information to Talkdesk's recording servers every few seconds to perform AI analysis thereon.  That AI analysis captured Seever's intent and/or reason for calling; extracted mood, tone and/or sentiment insights to understand how he was feeling during the call; and tracked any keywords he may have said during the conversation.  Seevers, during the call, asked about Zumiez's sneakers brands, specifically Vans, its store hours and what other items they carry, and disclosed his telephone number.  Talkdesk's technology captured his personal information and extracted insights.

70.    Through this process, Talkdesk read and learned, in real time, the contents of Plaintiff's conversation with Zumiez.

71.     Neither Zumiez nor Talkdesk procured Plaintiff's prior consent, express or otherwise, to have Defendant eavesdrop on Plaintiff's conversation with Zumiez.  Nor did Plaintiff give his prior consent, express or otherwise, to Talkdesk or Zumiez to allow Defendant to wiretap his confidential communications with Zumiez.

72.     Zumiez failed to inform Plaintiff Seevers, prior to recording: (i) that a third party, Talkdesk, was listening in on Plaintiff's communications with Zumiez, (ii) that a third party, Talkdesk, was tapping or otherwise making an unauthorized connection with Plaintiff's telephone conversation using CX Cloud and the Services, and (iii) that the content of Plaintiff's confidential communications with Zumiez were being recorded, collected, intercepted, and analyzed by a third party, Talkdesk, using CX Cloud and the Services.  Zumiez therefore failed to procure Plaintiff's consent for the conduct at issue.

73.     Talkdesk also failed to procure Plaintiff Seevers' consent for Talkdesk's software recording and examination of his voice for emotion, tone, or mood and the content of his communications.

74.     Plaintiff Seevers has, accordingly, had his privacy invaded and been exposed to the risks and harmful conditions created by Talkdesk's violations of CIPA alleged herein.

## CLASS ALLEGATIONS

75.     Plaintiff Lien seeks to represent a Class defined as all residents of the State of California who, during the applicable statute of limitations period, called Patagonia while in California and had their conversations with Patagonia recorded, monitored, or listened to by Defendant using CX Cloud and the Services (the "Patagonia Class").

76.     Plaintiff Seevers seeks to represent a Class defined as all residents of the State of California who, during the applicable statute of limitations period, called Zumiez while in California and had their conversations with Zumiez recorded, monitored, or listened to by Defendant using CX Cloud and the Services (the "Zumiez Class").

77.     The Patagonia Class and the Zumiez Class shall collectively be referred to as the "Class."

78.     The following people are excluded from the Class: (1) any Judge presiding over this action and members of her or her family; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or their parents have a controlling interest (including current and former employees, officers, or directors); (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

79.     **Numerosity:** The number of people within the Class is substantial and believed to amount to thousands of people.  It is, therefore, impractical to join each member of the Class as a named Plaintiff.  Further, the size and relatively modest value of the claims of the individual members of the Class renders joinder impractical.  Accordingly, utilization of the class action mechanism is the most economically feasible means of determining and adjudicating the merits of this litigation.  Moreover, the Class is ascertainable and identifiable from records belonging to Defendant.

80.     **Commonality and Predominance:** There are well-defined common questions of fact and law that exist as to all members of the Class and that predominate over any questions affecting only individual members of the Class.  These common legal and factual questions, which do not vary between members of the Class, and which may be determined without reference to the individual circumstances of any Class member, include, but are not limited to, the following:

> (a)     Whether Defendant violated CIPA § 631;
>
> (b)     Whether Defendant sought or obtained prior consent—express or otherwise—from Plaintiffs and the Class; and
>
> (c)     Whether Plaintiffs and members of the Class are entitled to actual and/or statutory damages for the violations.

81.    **Typicality:** The claims of the named Plaintiffs are typical of the claims of the Class because the named Plaintiffs, like all other members of the Class, had the content of their communications read, learned, analyzed, and/or examined by Talkdesk.

82.    **Adequate Representation:** Plaintiffs are an adequate representative of the Class because their interests do not conflict with the interests of the Class they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously.  The interests of the Class Members will be fairly and adequately protected by Plaintiffs and their counsel.

83.    **Superiority:** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of members of the Class.  Each individual member of the Class may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## CAUSES OF ACTION

### COUNT I
**Violation of the California Invasion of Privacy Act,
Cal. Penal Code § 631(a)**

84.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

85.    Plaintiffs bring this claim individually and on behalf of the Class against Defendant.

86.     CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct."  *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978).

87.     To establish liability under CIPA § 631(a), Plaintiffs need only establish that the Defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> *Or*
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> *Or*
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> *Or*
>
> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

88.     CX Cloud which includes the Services is a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

89.     Talkdesk is a separate legal entity that offers "'software-as-a-service' and not merely a passive device."  *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Accordingly, Talkdesk was a third party to any communication between Plaintiffs and members of the Class, on the one hand, and Patagonia or Zumiez, on the other.  *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 649 F Supp. 3d 891, 900 (N.D. Cal. 2023); *Turner v. Nuance Communications, Inc.*, 2024 WL 2750017, at *10 (N.D. Cal. May 28, 2024); *Gladstone v. Amazon Web Servs., Inc.*, 2024 WL 3276490, at *6 (W.D. Wash. July 2, 2024).

90.    At all relevant times, through CX Cloud, Talkdesk intentionally tapped, electrically or otherwise, the lines of telephone communication between the Plaintiffs and members of the Class, on the one hand, and Patagonia or Zumiez, on the other hand.

91.    At all relevant times, through CX Cloud, Defendant willfully and without the consent of all parties to the communication, or in any unauthorized manner, read or attempted to read or learn the contents or meaning of electronic communications of the Plaintiffs and members of the Class, while the electronic communications were in transit or passing over any wire, line or cable or were being sent from or received at any place within California.

92.    At all relevant times, Defendant used the wiretapped communications to maintain and improve its Services, as well as to train its AI models.

93.    Plaintiffs and Class Members did not consent to any of Defendant's actions discussed above.  Nor have Plaintiffs or Class Members consented to Defendant's intentional access, interception, reading, learning, recording, collection, and analysis of communications from Plaintiffs and Class Members.

94.    Pursuant to Cal. Penal Code § 637.2, Plaintiffs and the Class have been injured by the violations of CIPA § 631(a) and seek statutory damages of $5,000 for each of Talkdesk's violations of CIPA § 631(a).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendant, as follows:

(a)    For an order certifying the Class under Fed. R. Civ. P. 23, naming Plaintiffs as the representatives of the Class, and naming Plaintiffs' attorneys as Class Counsel to represent the Class;

(b)    For an order declaring that Defendant's conduct violates the statute referenced herein;

(c)    For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

(d)    For statutory damages of $5,000 for each violation of CIPA § 631(a);

(e)     For pre- and post-judgment interest on all amounts awarded;

(f)     For an order of restitution and all other forms of equitable monetary relief; and

(g)     For an order awarding and the Class their reasonable attorney's fees and expenses and costs of suit.

### **JURY TRIAL**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury for all issues so triable.


Dated: September 13, 2024                    Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:_____*/s/ Neal J. Deckant*_____
         Neal J. Deckant

Neal J. Deckant (State Bar No. 322946)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-Mail: ndeckant@bursor.com

*Attorneys for Plaintiffs*